**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **H.S. b/n/f REBECCA GOODALL,** | § | |
| **Plaintiffs,** | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. 4:26-cv-4239** |
| **INTERNATIONAL LEADERSHIP OF** | § | |
| **TEXAS PUBLIC CHARTER SCHOOL,** | § | |
| **Defendant.** | § | **JURY DEMAND** |
| | § | |
| | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

NOW COMES H.S. (hereinafter "the Student") by and through her next friend and natural parent Rebecca Goodall (collectively "Plaintiffs" herein) and files this *Original Complaint* alleging that the International Leadership of Texas Public Charter School and their Staff (hereinafter referred to as "ILTexas" or "the Charter School") violated the various rights of the Student as more specifically pled herein. Plaintiffs reserve the right to replead if new claims and issues arise upon further development of the facts, as permitted by law. In support, thereof Plaintiffs would respectfully show this tribunal the following:

## I. BRIEF INTRODUCTION TO THE CASE

1. H.S. is currently fifteen (15) years old. On September 10, 2024, she was forcibly slammed into a wall and onto the floor by Student A, another student at the Charter School. It was well-known by Staff that Student A had a history of attacking other students but even so but the Defendant they failed to protect H.S. from Student A. The attack resulted in a concussion and an exacerbation of conditions related to a H.S.' pre-existing traumatic brain injury ("TBI"). This attack significantly worsened her already impaired cognitive functioning,

emotional regulation and ability to access education services. As a person with a disability before the attack, Importantly, H.S. is protected by both Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 ("the Rehab Act") and Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §12132 ("ADA") and the rules and regulations promulgated thereunder. Accordingly, H.S. by and through her mother files this *Original Complaint* alleging violations of the Rehab Act and ADA.

## II. JURISDICTION

2. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1331 and § 1343, because the matters in controversy arise under the Constitution and laws of the United States.

## III. VENUE

3. Venue is proper in this Court under 28 U.S.C. § 1391(b) because the events and omissions giving rise to the Plaintiff's claims occurred in the Southern District of Texas, Houston Division, where International Leadership of Texas ("IL Texas") operates.

## IV. PARTIES

4. H.S. lives with her parent Rebecca Goodall in College Station, Texas. At all times pertinent to this case, H.S. was enrolled in the IL Texas Charter School.

5. The Defendant IL Texas is a public charter school organized under the laws of the State of Texas. Plaintiff reasonably believes this Defendant will be represented by Ms. Kendra Yoch, of Thompson & Horton LLP, Ross Tower, Suite 3150, 500 North Akard St. Dallas, Texas 75201, (972) 734-5416 [Telephone], kyoch@thompsonhorton.com [Email].

## V. FACTUAL RESUME

A. SCHOOL BOARD POLICIES & PROCEDURES AND PARENTS' RIGHTS

6. The School Board has developed policies and procedures regarding discrimination, harassment, bullying, and the rights of students, including students with disabilities. These policies are based upon federal and state law and are designed to provide protection from a hostile educational environment and to ensure prompt and effective steps reasonably calculated to end the misconduct, eliminate the hostile educational environment, prevent its recurrence, and, as appropriate, remedy its effects. Some have found their way into the Texas Education Code, Title 2 (Public Education), Subtitle G (Safe Schools); Chapter 37 (Discipline); Subchapter A (Alternative Settings For Behavior Management) and Subtitle E (Students and Parents); Chapter 26 (Parental Rights & Responsibilities).

7. Others are enunciated in the Texas Family Code, Title 5 (The Parent-Child Relationship); Subtitle B (Suits Affecting The Parent-Child Relationship); Chapter 151 (Rights And Duties In Parent Child Relationship). In fact, Texas Family Code § 261.101(b) requires that any professional, including educators and school administrators, who has reasonable cause to believe that a student has been subjected to abuse, neglect, or a threat to their physical or emotional safety, must make a report to appropriate authorities within 48 hours. In this matter, school staff were aware of ongoing harassment, witnessed a violent peer-on-peer assault, and were made aware of serious post-incident effects including concussion symptoms and emotional distress. The school's failures to respond with appropriate urgency or initiate required child protection reporting procedures reflect a failure to comply with mandatory reporting obligations of § 261.101(b).

8. The International Leadership of Texas Charter School System ("IL Texas") has also adopted written policies and procedures regarding discrimination, harassment, bullying, and the rights

of students with disabilities. These policies are published in the ILTexas Board Policy Manual and the ILTexas Parent/Student Handbook and are based on both federal mandates and Texas law, including the Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act, and Title II of the Americans with Disabilities Act (ADA). For instance, once on notice to do so ILTexas is required to take prompt and effective steps to investigate allegations of bullying and harassment of a student with a disability, eliminate any hostile environment, prevent recurrence, and remedy its effects as appropriate.

9. By way of example, ILTexas Policy 3.10.1, titled Freedom from Bullying and Cyberbullying, prohibits bullying, harassment, and retaliation by students or staff based on disability or any other protected status. The policy is based on the requirements of federal laws such as the IDEA, Section 504, and the ADA, and requires ILTexas to take prompt and appropriate steps to investigate and address reported incidents. Under this policy, bullying includes verbal or physical aggression that interferes with a student's education or substantially disrupts the educational environment.

10. In addition, ILTexas Policy 3.10.2, Prompt Response and Parent Notification, requires that the school administrator or designee promptly notify the parents or guardians of any student alleged to have experienced prohibited conduct, including bullying or harassment, or of any student alleged to have engaged in such conduct. The policy further mandates that investigations must be initiated within three school days and completed within ten school days, with documentation of findings, disciplinary outcomes, and corrective measures reasonably calculated to prevent recurrence.

11. Further, Policy 3.10.3, Disciplinary Action and Interim Measures, provides that when

appropriate, ILTexas must take interim actions to protect students before the conclusion of an investigation, including class changes, increased supervision, or separation of the involved students. If the allegations are substantiated, disciplinary consequences are imposed in accordance with the ILTexas Student Code of Conduct. These interim measures include but are not limited to Such measures are designed to restore or preserve equal access to the district's education program or activity without unreasonably burdening the other party, including measures designed to protect the safety of all parties, maintain the district's educational environment, or deter or prevent further harm or disruption. Supportive measures may include counseling, extensions of deadlines or other course-related adjustments, modifications of work or class schedules, campus escort services, mutual restrictions on contact between the parties, changes in work or district-provided housing locations, leaves of absence, increased security and monitoring of certain areas of the campus, and other similar measures.

12. Moreover, and addition to the foregoing, IL Texas policies reflected a heightened focus on student safety, medical oversight, and prevention of repeat head injury. It required trained personnel, multi disciplinary medical involvement and the use of a Concussion oversight team to manage suspected head injuries.

13. ILTexas Policy 3.11, Mandatory Reporting of Abuse or Harm, mirrors Texas Family Code § 261.101(b), and requires that any staff member who has reason to believe that a student has been subjected to abuse, neglect, or physical or emotional harm must report the information within 48 hours to Child Protective Services or law enforcement. This includes reporting peer-on-peer aggression that results in substantial harm or indicates a pattern of targeted

harassment or bullying. Failure to report may result in serious criminal and administrative consequences under Texas law.

B. ABOUT H.S.

14. H.S. was born in December 2010. As a young child she was injured causing a Traumatic Brain Injury ("TBI"). H.S. lives with her mother in the College Station ISD catchment area. While there she endured a persistent and escalating pattern of sexually inappropriate conduct, threats of physical assault and emotionally abusive peer interactions. As a result of the prior district's failure to protect her, H.S.' Mother made the difficult decision to enroll her daughter in the International Leadership Of Texas ("ILTexas") a public charter school for what would be her eighth grade for the 2024-2025 school year.

15. Upon enrolling at ILTexas, H.S.'s mother gave the Charter School Staff notice of her daughter's TBI, pre-existing condition, medical fragility, recent trauma and need for a trauma-informed and a safe educational setting. This information was shared with the Registrar, Ms. Debbie; the Assistant Principal, Michelle Kelley; the Counselor, Suzanne Wyman and her Special Education Teacher advising them of all the above and need to avoid further neurological stressors. Notwithstanding her physical and mental disabilities previous Educators consistently describe H.S. as polite, respectful and cooperative. Despite having this important information the Charter School failed to implement any appropriate accommodations or protective measures for H.S. leaving her vulnerable to future harm.

C. ABOUT STUDENT A

16. Student A was a student at the Charter School with a well-known history of aggressive, volatile, and disruptive behaviors. Her conduct was widely known among students, teachers

and Administrators. She was frequently described as someone who would "crash out," a term used by students to characterize Student A's unpredictable outbursts involving yelling, throwing objects, striking peers, attempting to climb fences, exhibiting shaking episodes, staring blankly at others, and screaming statements such as "I'm tired of this!" " I want to go home!" These episodes were not isolated and were audible down the hallways and across the campus.

17. Upon information and belief, apparently this pattern of behavior by Student A was not new. In fact later reports noted she had exhibited these same volatile behaviors at her prior schools before her enrollment at the Chatter School including College Station ISD at the Rock Prairie Elementary School and also at te A&M Consolidated Middle School. At both stops Student A was known among peers for exhibiting disruptive behaviors, including screaming, rocking, and engaging in physical altercations with other students. In fact, Student A was involved in a criminal proceedings arising from the assault of an administrator at the Robertson County ISD.

18. In the early Fall Semester of 2024, Student A's behavior at the Charter School was the same and ongoing. They were not isolated, confined or subtle. They were so overt that Students across grade levels were aware of her volatility because her episodes were loud, public, and often heard down the hallways and often witnessed by classmates and staff. This included teachers Nikita Mendiola, Morgan Volker, Aisha Robinson and other Special Education teachers. All were also well-aware of her past behavioral history and the risk she posed to others. At times these teachers instruct her to "calm down," instruct other students to stay away from Student A or and even remove Student A from their classrooms, and was known

to crash out."

19. Upon information and belief, Assistant Principal, Ms. Kelley was responsible for handling of disciplinary and behavioral issues involving eighth grade students, including Student A. On at least two occasions early in the Fall 2024 Semester, Ms. Kelley removed Student A from the hallway when she was screaming in the halls. Also early on in the semester, Student A punched another student in the face and was suspended for several days by Assistant Principal, Kelley. After returning to school, Student A's aggressive conduct continued and was witnessed by other students, Student B, Student C, Student D, and Student E, as well as other teachers, all consistent with her ongoing pattern of escalating behaviors. Upon reason and belief Plaintiffs note that Assistant Principal Kelley was kept apprised of these incident.

D. STUDENT A ATTACKS H.S.

20. In late August, early September Student A repeatedly called H.S. a "bitch," "retarded bitch," and retarded ass bitch," including an incident on September 9, 2024, in Social Studies class with Mrs. Voelker. Student A told H.S. she did not belong in a group project and was observed staring at her in an intimidating and aggressive manner. Ms. Vollker heard Student A, stopped doing paperwork and looked at the two girls but did not otherwise intervene or take further action against Student A.

21. On or about the same day while in the cafeteria, Student A called H.S. "Retarded bitch" Due to her problem in processing H.S. asked Student A what she said and Student A reiterated "retarded ass bitch!" H.S. walked away. No action was taken against Student A as it was common to not intervene with Student A unless and until her behavior escalated to rocking, violence, or other extreme conduct, like the times she attempted to climb a fence.

22. On or about September 10, 2024, H.S. was physically attacked by Student A in a highly disturbing incident. The attack occurred in the hallway outside the 8th grade classrooms, near Mr. Garcia's and Ms. Chen's rooms, as H.S. was transitioning to her final class period. During transition times all teachers are stationed outside their classroom, approximately eight to ten. Student A passed H.S. in the hallway and stared at her. After walking past H.S., Student A suddenly grabbed H.S. by the hair and began punching her in the back of the head. Studentt A screamed repeatedly, “You stupid bitch! You stupid bitch!” as she struck H.S. H.S. attempted to get away but could not, and attempted to defend herself by grabbing Student A's hair and trying to push her away. H.S. was smaller in stature, about 3 inches shorter and about 25 pounds lighter than Student A, and unable to overcome her strength. Student A then lifted H.S. by the shoulders, slammed her into the wall and then forcefully onto the floor. Student A then began to choke H.S. while she lay on her back with her backpack still on.

23. Despite the presence of students and nearby staff including Xiuqin Chen, Cesar Garcia Aguilar, Adolf Ariza Quintero and Tanesha Rich-Boatman, the assault continued for a prolonged period. H.S. recalls hearing at least one teacher shout out “Code Red!” and another instruct students to “Get into the classroom, don’t come out!” while students and staff looked on. Even so, no one attempted to try and stop the assault. Nor did staff members Morgan Voelker, Matthew Austin, and Nikita Mendiola who were all in the hallway. Eventually, School Resource Officer Chad Jones intervened and pulled Student A off of H.S. She remained on the ground, momentarily stunned, before being helped up by Assistant Principal Ms. Kelley. H.S. was bleeding from her finger where a nail had been torn off and began

screaming in pain and panic.

24. Rather than provide comfort or emergency medical care, Principal Bolzan told H.S. to stop screaming or she would receive a referral. Ms. Kelley added that H.S. needed to be mindful of younger students in the hallway. This response reflected a punitive tone and lack of trauma-informed care for a visibly injured child with a disability. H.S. was taken to Ms. Kelley's office where the school nurse, Grissel Sarellano evaluated her. Despite H.S. expressing concern about a concussion, Principal Bolzak told her she did not have a concussion and the school nurse, Grissel Sarellano, stated that she would be fine by the next day and dismissed her symptoms as minor. Ms. Kelley contacted H.S.'s mother and stated that H.S. was in an altercation, but had not initiated it, which was later confirmed by security footage. In any case, and upon arrival, H.S.'s family found her injured and emotionally overwhelmed, with only a frozen paper towel "ice pack" applied to her head.

25. H.S. was taken to St. Joseph's Urgent Care, where she was diagnosed with a concussion and additional injuries. Further imaging was required due to significant pain and limited mobility. She experienced continued symptoms in the days and weeks following, including headaches, visual sensitivity, cognitive fog, emotional dysregulation, and panic. Other students later informed H.S. that Student A had been yelling in the hallways after the attack and that she had returned to campus briefly before being removed again. This news caused H.S. further fear and emotional harm.

E. FAILURE TO FOLLOW CONCUSSION SAFETY POLICIES

26. Following the violent assault on September 10, 2024, IL Texas failed to provide trauma informed or medically responsive support to H.S., despite actual knowledge if her disability

classifications, medical fragility, and history of neurological vulnerability. H.S. was forcibly slammed into a wall and the floor, an impact mechanism consisted with a suspected concussion, yet no injury protocol, medical evaluation, or protective response was initiated at the time of the incident. At the time of the assault, IL Texas maintained detailed, medically driven concussion safety policies applicable to students who sustained head injuries during school related activities, including mandatory removal from activity, mandatory oversight, documentation, and structured return-to-participation protocols. These policies reflected the District's recognition that head injuries present serious neurological risks and require immediate, coordinated, and medically informed responses to protect student health and educational access.

27. In contrast to the district's concussion protocols for interscholastic athletes, which require immediate removal from activity, physician evaluation, written medical clearance, documented recovery benchmarks, and supervised reentry, H.S. was pressured to return to campus under threat of truancy without comparable medical clearance, safety planning, or accommodation of her neurological limitations.

28. The District's failure to apply its own concussion safety principals outside the athletic context resulted in the absence of trauma-informed supports, psychological evaluation, or appropriate academic modifications. Instead, H.S. was placed in a virtual learning model incompatible with her medical and cognitive needs, requiring extensive screen time and independent work despite medical directives to limit such activity following a concussion.

F. EFFECTS UPON H.S.

29. During this period, H.S. experienced significant academic regression, particularly in

mathematics, as a result of ongoing concussion-related cognitive impairment. Despite repeated notice from her mother regarding worsening symptoms, balance issues, confusion, and the need for accommodations, ILTexas failed to respond with urgency or implement appropriate supports and making it mandatory for her to continue participating in gym class. As a result of this failure to follow its own concussion safety procedures, failure to recognize and respond to observable neurological symptoms, mischaracterization of medical warning signs as disciplinary concerns, and dismissal of the family's formal grievance left H.S. without oversight, without protection, and without a safe path to recovery. These omissions compounded her injuries, denied her meaningful access to education, and reflect deliberate indifference to her health, safety, and disability-related needs.

## VI. <u>STATE ACTION</u>

30. Plaintiff incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth. In addition, each sentence and paragraph below, likewise incorporates by reference as if fully set forth herein, the one above it.

31. At all relevant times, the School District and its agents were acting under color of state law and state authority when the Student H.S. was subjected to the acts, omissions, wrongs and injuries set forth herein.

## VIII. <u>VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT OF 1973</u>

32. The School District receives federal funds and thus must follow the requisites of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 ("Section 504" or "the Rehab Act") . The implementing regulations of Section 504 require that each state that receives disbursements, including the state's political subdivisions such as local school districts, must ensure all

students with disabilities are given appropriate and necessary accommodations, pursuant to federal law and rules. To the degree that a policy or practice hinders honest consideration of a disabled student's unique and individualized needs, and fails to accommodate that child's disability and keep the student safe, it violates Section

A. FAILURE TO KEEP SAFE CLAIM

33. In addition to and in the alternative to the above, the Student asserts that the School District failed to provide her a safe and non-hostile educational environment, and as such she is a victim of discrimination based upon disability pursuant to Section 504.

B. DISPARATE TREATMENT CLAIM

34. The above noted facts also support a plausible "Disparate Treatment Claim" also pursuant to the Rehabilitation Act.

C. FAILURE TO MODIFY AND/OR ACCOMMODATE CLAIM

35. The above noted facts also support a plausible "failure to modify claim" pursuant to the Rehabilitation Act and similar to the ADA claim noted below.

36. The above noted facts also support a plausible "failure to accommodate claim" pursuant to the Rehabilitation Act and similar to the ADA claim noted below.

37. Each claim, separately and together rise to the level and support the contention that the Student was a victim of discrimination based upon disability by the School District.

## IX. CLAIMS PURSUANT TO THE ADA

38. In addition, and in the alternative to the foregoing claims, the facts as previously described demonstrate violations of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq. ("ADA"). At all relevant times, the School District was a public entity within the meaning

of Title II of the ADA and was required to provide qualified individuals with disabilities equal access to its services, programs, and activities, and to make reasonable modifications when necessary to avoid discrimination on the basis of disability.

39. Despite documented diagnoses of H.S.'s traumatic brain injury and a specific learning disability, the ILTexas failed to implement reasonable accommodations and modifications necessary to ensure Plaintiff's ability to have equal access to academic and non-academic programs as compared her non-disabled peers in violation of Title II of the Americans with Disabilities Act.

## X. <u>RATIFICATION AND RESPONDEAT SUPERIOR</u>

40. The International Leadership of Texas School Board ratified the acts, omissions, and customs of school district personnel and staff as set forth above.

41. Additionally, the School Board is responsible for the acts and omissions of ILTexas employees who were otherwise responsible for the safety, supervision, and well-being of students, including H.S., pursuant to the theory of Respondeat Superior.

## XI. <u>PROXIMATE CAUSE</u>

42. Each and every one of the foregoing acts and omissions by ILTexas, taken jointly and severally, constitute a direct and proximate cause of the injuries and damages experienced by Plaintiffs as specified herein.

## XII. <u>SPOLIATION</u>

43. Plaintiff hereby requires and demands that ILTexas preserve and maintain all evidence pertaining to any claim or defense related to the violations, causes of action, facts, and resulting damages set forth herein and/or made the basis of this petition and request for due

process. This includes, but is not limited to: statements, photographs, videotapes, audiotapes, surveillance footage, security tapes, business or medical records, incident reports, telephone records, emails, text messages, electronic data/information, and any other evidence, potential evidence, or potentially discoverable documents.

44. ILTexas is on notice of its obligation to preserve such evidence. Any failure to preserve, alteration, or destruction of relevant evidence may constitute spoliation and may result in the imposition of appropriate sanctions or evidentiary remedies as permitted by law, including adverse inferences, upon a proper showing before the Court.

## XIII. DAMAGES

45. As a direct and proximate result of Defendant's acts and omissions, Plaintiff has suffered injuries and damages for which she is entitled to recover under federal law, including but not limited to the following:

a. Nominal damage;

b. Consequential Damages;

c. Loss of equal access to educational programs, services, and benefits;

d. Physical pain in the past;

e. Medical expenses in the past;

f. Mental anguish in the past;

g. Mental anguish in the future;

h. Mental health costs in the past;

i. Mental health costs in the future;

j. Reimbursement for past private educational services, tutoring, evaluations, or

placements necessitated by Defendant's failure to provide equal access and reasonable accommodation;

k. Reimbursement for future private educational services, tutoring, evaluations, or placements reasonably required to remediate the effects of Defendant's unlawful conduct;

l. Reimbursement of past and future out-of-pocket expenses incurred by Plaintiff and her family as a direct result of the acts and omissions of the Defendant;

m. Costs of representation;

n. Any such other relief as may be deemed appropriate in law or in equity, or both.

## IV. REQUEST FOR TRIAL BY JURY

46. Plaintiffs respectfully request trail by a jury.

## PRAYER

Plaintiffs respectfully pray for judgment against Defendant in the manner and particulars set forth above, and for relief in an amount sufficient to fully compensate H.S. for the injuries and damages enumerated herein, pursuant to Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act including an award of reasonable attorneys' fees, litigation expenses and costs as permitted by law, and such other and further relief, whether legal or equitable or both, as the Court deems just and proper.

Respectfully submitted,

/s/ Martin J. Cirkiel
Mr. Martin J. Cirkiel, Esq.
marty@cirkielaw.com [Email]
Texas Bar No.: 00783829
Fed. ID No.: 21488
Cirkiel Law Group, P.C.

1005 W. 41st St., Suite 201
Austin, Texas 78756
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]
ATTORNEYS FOR PLAINTIFF